STATE of Missouri ex inf. John C. DAN-
FORTH, Attorney General, Relator,

v.

Norman L. MERRELL et al., Members,
State Fiscal Affairs Committee, and J.
Neil Nielsen, Commissioner of Adminis-
tration, Respondents.

No. 59075.

Supreme Court of Missouri,
En Banc.

Nov. 25, 1975.

**210**

John C. Danforth, Atty. Gen. of Mo., Walter Nowotny and C. B. Burns, Jr., Asst. Attys. Gen., for relator.

Cullen Coil, Carson, Monaco, Coil & Riley, P.C., Jefferson City, for respondents Merrell, and others.

Charles E. Valier, Jefferson City, for respondent Nielson.

HENLEY, Judge.

This is an original proceeding in quo warranto by the State on the information of the Attorney General (informant). The primary question presented is whether respondents have authority to change, alter or amend the purpose for which money appropriated by the general assembly may be used. We hold they do not.

The background out of which this case arose is as follows. In August, 1972, the people adopted an amendment of Article IV of the constitution of Missouri, providing,[1] in general, for the reorganization of the executive department of state government into not more than 14 departments, an office of administration, and the six existing state elective offices. Section 28 of the amended Article is as follows:

"No money shall be withdrawn from the state treasury except by warrant drawn in accordance with an appropriation made by law, nor shall any obligation for that payment of money be incurred unless the commissioner of administration certifies it for payment and certifies that the expenditure is within the purpose as directed by the general assembly of the appropriation and that there is in the appropriation an unencumbered balance sufficient to pay it. At the time of issuance each such certification shall be entered on the general accounting books as an encumbrance on the appropriation. No appropriation shall confer authority to incur an obligation after the termination of the fiscal period to which it relates, and every appropriation shall expire six months after the end of the period for which made." The 77th General Assembly, at the First Extraordinary Session of its First Regular Session, implemented the 1972 amendment of Article IV by enacting what is known as the "Omnibus State Reorganization Act of 1974" (hereinafter the Act or Reorganization Act). It became ef-

1. Section 12, and other sections, of the amended Article. See Laws of Missouri, 1972, page 1049.

fective May 1, 1974. Section 1.6(2) of the Act is, in part, as follows:

"The purpose of appropriations made to any department in the executive branch of government shall not be altered without the prior approval of the fiscal affairs committee and the concurrence of the commissioner of administration."[2]

Thereafter, the general assembly enacted laws appropriating money to the several departments (and to elective offices) of the executive branch for specified purposes. Some sections of these laws contained these words:

"The purpose of this appropriation shall not be altered without the prior approval of the Fiscal Affairs Committee and the concurrence of the Commissioner of Administration and any monies not spent specifically as directed shall lapse."

In general, the appropriations were to a department for a named division thereof for three separate purposes: 1. personal service; 2. equipment purchase and repair; and 3. operation. Some of the appropriation laws divided the third purpose, "operation," into more specific purposes (or detailed classes), such as: (1) "travel and transportation, office supplies and equipment, communications, data processing expenses, printing and publication, institutional services, and other expenses"; (2) "building and grounds expense"; (3) "professional and technical services"; (4) "data processing and professional and technical services"; (5) "institutional services, other expenses, and building and grounds expenses"; and others.

After enactment of appropriation laws the respondents, Norman L. Merrell, and others, as members of the committee on state fiscal affairs (hereinafter the Committee), determined (in several instances) that it was necessary to change the purpose of particular appropriations and authorized or directed the respondent, commissioner of administration (hereinafter the Commissioner), to make the change by transferring a specified amount of money from one purpose to another. An example of this type of transaction is a letter dated March 20, 1975, from the Committee to the Commissioner, the content of which is as follows:

"(1) 'Mr. Chairman, I move that in accordance with the provisions of Section 1, Subsection 6, of Senate Bill 1, as enacted in the First Extraordinary Session of the 77th General Assembly, and Article 4, Section 28 of the Constitution of the State of Missouri, this Committee authorizes the Commissioner of Administration to change the purpose of Section 3.010 of House Bill 1003, as enacted in the Second Regular Session of the 77th General Assembly as follows:

(a) $12,000 General Revenue may be transferred from class seven operation to class nine operation.'

"(2) 'Mr. Chairman, I move that in accordance with the provisions of Section 1, Subsection 6, of Senate Bill 1, as enacted in the First Extraordinary Session of the 77th General Assembly, and Article 4, Section 28 of the Constitution of the State of Missouri, this Committee authorizes the Commissioner of Administration to change the purpose of Section 4.405 of House Bill 1004, as enacted in the Second Regular Session of the 77th General Assembly as follows:

(a) $115,000 General Revenue may be transferred from class four operation to class five operation.'

"(3) 'Mr. Chairman, I move that in accordance with the provisions of Section 1, Subsection 6, of Senate Bill 1, as enacted in the First Extraordinary Session of the 77th General Assembly, and Article 4, Section 28 of the Constitution of the State of Missouri, this Committee authorizes the Commissioner of Administration to change the purpose of Section 4.145 of House Bill 1004, as en-

---

2. The "fiscal affairs committee" referred to in the quotation is the committee on state fiscal affairs, a permanent joint committee of the general assembly created by § 21.470 (Laws of Missouri, 1969, p. 87) with duties prescribed by § 21.500 (Laws of Missouri, 1971, p. 115).

acted in the Second Regular Session of the 77th General Assembly as follows:

(a) $22,357 General Revenue may be transferred from class seven operation to class two equipment purchase and repair.'

"(4) 'Mr. Chairman, I move that in accordance with the provisions of Section 1, Subsection 6, of Senate Bill 1, as enacted in the First Extraordinary Session of the 77th General Assembly, and Article 4, Section 28 of the Constitution of the State of Missouri, this Committee authorizes the Commissioner of Administration to change the purpose of Section 6.360 of House Bill 1006, as enacted in the Second Regular Session of the 77th General Assembly as follows:

(a) $113,381 General Revenue may be transferred from class four operation to class five operation.'

"(5) 'Mr. Chairman, I move that in accordance with the provisions of Section 1, Subsection 6, of Senate Bill 1, as enacted in the First Extraordinary Session of the 77th General Assembly, and Article 4, Section 28 of the Constitution of the State of Missouri, this Committee authorizes the Commissioner of Administration to change the purpose of Section 9.500 of House Bill 1009, as enacted in the Second Regular Session of the 77th General Assembly as follows:

(a) $60,000 Revenue Sharing Trust Fund appropriated in Section 9.500 for Sewer Line on West Campus may be used for roof repairs, parking lots and service roads, and air conditioning systems repair.'

We are forwarding copies of the above to the agencies involved." An example of another type of transaction to effect such a change is a letter dated July 19, 1974, from the Committee direct to the director of the department of social services, with a copy to the Commissioner, which letter is, in pertinent part, as follows:

"Please be advised that the Committee on State Fiscal Affairs in its July 16, 1974 meeting agreed that you should make the necessary shift in the Federal Soldiers Home, Operation Appropriation, in order that the $128,000 be placed in the Building and Grounds Expense account. This shift is to be made in lieu of a request for an emergency or supplemental appropriation."

The Commissioner, in his return to our show cause order and in his brief, takes the position and asserts that he has, under authority and compulsion of an opinion of the attorney general and *State ex rel. State Board of Mediation v. Pigg*, 244 S.W.2d 75, 78[3–4] (Mo.banc 1951), refused to concur in the Committee's direction to alter the purpose of appropriations, but will concur if the court determines that he has authority to do so.

It is clear from the pleadings that the Committee claims that it has the authority, with the concurrence of the Commissioner, to alter the purpose of appropriations made to a department of the executive branch by transferring money "earmarked" (appropriated) for a specified purpose from that purpose to another within a department. The Committee asserts that the general assembly had the power to and did grant it this authority by enactment of § 1.6(2) of the Reorganization Act, a general law enacted in accordance with the legislative process (Mo.Const. Art. III, §§ 21–33); that this law delegates to the Committee legislative power to make such transfers. We note that the Committee does not claim authority to transfer appropriated money from one department to another within the executive branch.

Section 23 of Article IV, the constitution, fixes the state's fiscal year, requires the general assembly to make appropriations therefor, and directs that "[e]very appropriation law shall distinctly specify the amount and purpose of the appropriation * * * ."

One purpose of this section is to provide the members of the legislative body with specific information from which each may determine whether he will approve or disapprove the amount and purpose of a proposed expenditure.

Section 36 of Article III, limits the legislative power to withdraw money from the

state treasury in these words: "the general assembly shall have no power * * * to permit the withdrawal of money from the treasury except in pursuance of appropriations made by law."

A state legislative body has the power to enact any law not prohibited by the constitution, and the state constitution, unlike the federal constitution which is a grant of powers, is a limitation on legislative power. *State ex inf. Danforth ex rel. Farmers Electric Cooperative v. State Environmental Improvement Authority,* 518 S.W.2d 68, 72[1] (Mo.banc 1975); *Three Rivers Junior College District v. Statler,* 421 S.W.2d 235, 237–238[2, 3] (Mo.banc 1967). By § 36 the people prohibit the general assembly from enacting any law which would, directly or indirectly, permit the withdrawal of money from the treasury for any purpose other than one specified in an appropriation law. And this prohibition includes the enactment of any law which would delegate to individual members of the general assembly authority to do, with respect to appropriations, what the general assembly itself may do only by an Act duly passed and approved.

Section 28 of Article IV, quoted above, completes the general constitutional scheme by which money may be withdrawn from the state treasury. That section prescribes the method and delimits the authority for any withdrawal in these words: "by warrant drawn in accordance with an appropriation made by law * * *." That section also fixes and limits the conditions under which the obligation of state money may be incurred. It does so in these words: "nor shall any obligation for [the] payment of money be incurred unless the commissioner of administration certifies it for payment and certifies that the expenditure is within the purpose * * * of the appropriation and that there is in the appropriation an unencumbered balance sufficient to pay it."

These sections of the constitution are unambiguous. They require no construction.

Their meaning is clear: money may not be withdrawn from the state treasury for any purpose other than that specified in an appropriation law. Any appropriation law which fails to specify distinctly the purpose of an appropriation would violate § 23, supra. Any law which permits the withdrawal of state money for any purpose other than that specified in an appropriation law would violate § 36, supra. Any certification by the Commissioner authorizing the incurring of an obligation and the payment of state money for any purpose other than that specified in an appropriation law would violate § 28, supra. Any withdrawal of money from the state treasury by a warrant drawn for a purpose other than that specified in an appropriation law would also violate § 28, supra.

The presumption is that in enacting the appropriation laws referred to in the letters of the Committee dated July 19, 1974, and March 20, 1975, the general assembly complied with the provisions of § 23, supra, requiring that the " * * * law distinctly specify the amount and purpose of the appropriation * * *." The parties do not contend the general assembly did not do so. We hold that it did so specify. In appropriating money to a department of the executive branch for use (for example) by a named division of the department with a designation of separate amounts of money for (1) personal service; (2) equipment purchase and repair; and (3) operation, the general assembly has specified three separate general purposes for which each amount specified is to be used. Further specificity of purpose results (for example) when a general purpose (such as "operation") expressed in an appropriation law is divided into two or more parts or subpurposes with a specified amount of money for that subpurpose.

The portion of § 1.6(2) of the Reorganization Act which authorizes the Committee, with the concurrence of the Commissioner, to alter the purpose of an appropriation is, within the meaning of Article

III, § 36, a law by which the general assembly has permitted the withdrawal of money from the treasury not in pursuance of an appropriation made by law. The Act permits the withdrawal of state money contrary to "an appropriation made by law" in that it authorizes the transfer of funds appropriated for a specified purpose to another purpose. For these reasons, that portion of § 1.6(2) of the Act, and similar provisions in any appropriation law, violate Article III, § 36, supra. Hence, the general assembly was without power to confer upon the Committee and the Commissioner the authority the Committee claims, and any exercise of the claimed authority would be a usurpation of power neither of them has.

Informant also charges that the Committee, with the concurrence of the supreme court, claims to have authority to allocate, and has allocated, money appropriated to that court in § 4.296 of House Bill 1004[3] of the 77th General Assembly (second regular session); that any action or attempted action by the Committee to allocate such funds under authority of § 4.296 violates Article IV, § 27, and other provisions, of the constitution. The money referred to is money appropriated to the supreme court as a contingent fund to be used for the payment of "Personal Service and related Operational expense in the event of unusual case workload in the  *  *  *  Circuits necessitating additional funds for carrying out the provisions of  *  *  *  [Chapter 600, RSMo Supp.1973]."[4]

The Committee, in its return, denies that it claims the authority to allocate money appropriated in § 4.296, supra, and, " *  * pleading hypothetically,  *  *  *  state[s] that if the provision as to 'allocation' of said  *  *  *  funds is not simply an amplification of the purpose of the appropriation, then  *  *  *  the language pertaining to 'allocation' is surplusage and does not affect the validity  *  *  *  of the appropriation."

During oral argument before the court, the Informant and the Committee agreed: (1) that the Committee does not have or claim the authority to "pass on" (allocate) the money appropriated in § 4.296; (2) that the money was appropriated to the court to be used, if necessary, to meet the contingency of any unusual case workload arising in the circuit courts requiring funds, in addition to those otherwise appropriated, to accomplish the purposes of Chapter 600, supra. In other words, they agree that the court has the sole authority to administer these funds under the conditions and for the purposes specified. In these circumstances, there is no justiciable issue for decision as to "allocation" of these funds, and the court will authorize the use of the funds when, and if, needed for the purposes specified.

The "allocation" referred to in § 4.296 is not, we note, the same as that step in the control of the expenditure of public funds referred to in Article IV, § 27, of the constitution. That step in the process of fiscal control has been accomplished by the chief executive before the court determines the need and authorizes the use (allocation) of any part of the contingent fund.

■■■ A change in procedure was initiated by the court in this case applicable to informations in the nature of quo warranto filed by the attorney general, ex officio: the show cause order directed to respondents stated that after their respective returns were filed, the court would (contrary to prior practice) then consider the pleadings and at that stage of the case determine, in its discretion, what further proceedings, if any, would be required.

The rule has been, and continues to be, that the attorney general in his official

---

3. More accurately described as Conference Committee Substitute for House Bill No. 1004.

4. This Chapter provides for the appointment and the payment of public defenders or other counsel to represent indigent persons charged or detained in connection with a felony. Sections 600.045 and 600.060.

capacity may file an information in the nature of quo warranto, without securing leave to file, and process (a show cause order) will issue as a matter of course. *State v. St. Louis Perpetual Marine Fire and Life Insurance Co.,* 8 Mo. 330, 331[1, 2] (1843); *State ex rel. Walker v. Equitable Loan and Investment Co. of Sedalia,* 142 Mo. 325, 41 S.W. 916, 918[1] (1897). Cf. *State ex rel. Young v. Buskirk,* 43 Mo. 111 (1868).

In *State ex rel. McAllister v. Cupples Station Light, Heat & Power Co.,* 283 Mo. 115, 223 S.W. 75[7] (banc 1920) the court said, (l. c. 84): "It has always been the practice in this state to issue the writ of quo warranto upon the application of the Attorney General, as a matter of course and without any investigation of the merits of the case * * * although in many other jurisdictions the court makes an investigation of the facts and finally exercises its discretion at the time of the application for the writ. * * * *In this state, however, the discretion of the court is not exercised until final hearing*." (Emphasis supplied.) From this the practice or rule developed that the court would not exercise its discretion to control the proceeding in the interim period between issuance of process and final judgment. What is said in this regard in *State ex rel. McAllister v. Cupples Station, etc.,* supra, and other cases, will no longer be followed.

The court will hereafter, as in this case, control the proceedings by the exercise of its discretion at any stage thereof after the issuance of its show cause order.

It is ordered that respondents cease and desist from altering the purpose of appropriations made by law.

SEILER, C. J., and HOLMAN, FINCH and DONNELLY, JJ., concur.

BARDGETT, J., concurs in separate concurring opinion filed.

MORGAN, J., dissents in separate dissenting opinion filed.

BARDGETT, Judge (concurring).

The dissenting opinion of Morgan, J., casts the issue in this case to be one of adjudicating the meaning of the word "purpose" as used in Art. IV, sec. 23, Mo.Const., and determining whether the appropriation laws involved in this case satisfied that section of our constitution. I do not believe that is the issue at all and for this reason I file this concurring opinion.

No one contends that the appropriation laws here involved failed to meet the requirements of Art. IV, sec. 23. To the contrary, the case is premised on the assumption, which I believe to be a valid one, that these appropriation bills satisfy the requirements of Art. IV, sec. 23, as to the "purpose" clause.

The basic issue here is whether or not the general assembly can constitutionally authorize a legislative committee and a representative of the executive branch of government, the commissioner of administration, to amend an appropriation law by switching money from one legislatively designated purpose to a different legislatively designated purpose.

In *State ex rel. Cason v. Bond,* 495 S.W.2d 385 (Mo. banc 1973), the court held the governor could not constitutionally change the purpose clause of an appropriation bill under his veto powers.

The case today holds that the general assembly cannot constitutionally delegate to a committee or to the executive department or to both of them the power to amend a law.

MORGAN, Judge (dissenting).

I respectfully dissent because (1) the principal opinion proscribes a needed and commendable effort to improve the efficiency of governmental activities insofar as they involve fiscal affairs and the expenditure of tax money, and (2) my belief that there is no constitutional prohibition against reaching such a worthy objective.

As to point one, a simple example will suffice. Assume that an agency or department has been appropriated $1,000. under "Repairs and Replacements" and $1,000. under "Operations," presumably based on the "estimated" needs of the particular governmental unit made nearly eighteen months before an anticipated expenditure. If the date of the actual enactment of the appropriation is used, the time gap remains approximately one year. In that year the $1,000. for "Repairs and Replacements" has been used and an unforeseen emergency arises for a new typewriter. Because of changed circumstances, the $1,000. earmarked for "Operations" may be intact. If I understand the principal opinion, it would prohibit the purchase of the needed typewriter until the next fiscal year, whereas the approach taken by the General Assembly would allow for meeting immediately that changed need of the agency or department—all within the general appropriation limits assigned to that unit of government. Undoubtedly, the fundamental objective of the expenditure of tax money by appropriation is to make it possible for governmental units to perform the duties incumbent upon them in the most effective manner and thereby best serve the public.

As to point two, the basic question is whether or not the constitution of this state prohibits the attainment of such a worthy objective. I do not believe it does. The extent to which appropriations must be itemized by the General Assembly is not prescribed in the constitution. Section 23 of Article 4 thereof provides, in part: "Every appropriation law shall distinctly specify the amount and purpose of the appropriation . . ." Other constitutional provisions, noted in the principal opinion, only serve to exact compliance with Section 23 and do not add or detract from the dictates thereof. Herein, we are concerned only with the meaning of the word "purpose" in that section. Does it require that all appropriations specify the amount allotted for paper clips to fulfill the requirement that there be a designated purpose? The principal opinion, without answering the question posed, seems to assume specificity is called for somewhere between the somewhat absurd paper-clip example given and what I believe is dictated by the constitution. By necessity or other reasons, governmental activities are performed by numerous units of government, and it is my opinion that a "one figure" appropriation to such a unit, agency or department that it may function meets the constitutional command in question. The amount and purpose would both be present therein. That the General Assembly may for reasons of accounting and planning find it helpful to make some breakdown into categories in order to resolve the "total" needed in an appropriation does not change or broaden the requirements of Section 23. The dictates thereof having been met absent such details, adjustments therein are not proscribed.

Admittedly, as detailed in the principal opinion, the General Assembly created a procedure for making *adjustments* and *transfers* within a particular budget by use of the unfortunate choice of words: *change of purpose.* The same is not only inaccurate and misleading but possibly created the present litigation. Nevertheless, the procedure is constitutionally acceptable and I would so declare. Those interested may see *In Re Opinion Of The Justices,* 302 Mass. 605, 19 N.E.2d 807 (1939).