**Pierre HEIDRICH and Maria Long,
Appellants/Respondents,**

v.

**CITY OF LEE'S SUMMIT,
Respondent,**

**Community Bank of Pettis County,
Respondent/Appellant.**

**Nos. WD 56869, WD 56900.**

Missouri Court of Appeals,
Western District.

May 31, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 2000.

Application for Transfer Denied
Oct. 3, 2000.

---

**1.** This was the rule in effect when Flint filed his brief. The Supreme Court has since amended the rule.

Sherwin Epstein, John Roe, Kansas City, for appellants.

Neil Shortlidge, T. Chris Williams, Kansas City, Christine Bushyhead, City Atty., Lee's Summit, Stanley Brian Cox, Sedalia, for respondent.

PAUL M. SPINDEN, Presiding Judge.

When the city council of Lee's Summit approved Community Bank of Pettis County's plan to erect a bank building at 1800 S.E. Blue Parkway, Pierre Heidrich and Maria Long asked the circuit court to declare that the plan did not conform to the city's comprehensive zoning ordinance and to enjoin erection of the bank building. They also averred that the ordinance approving the building's erection was void because it was arbitrary, unreasonable, not fairly debatable, illegal and unconstitutional, and they asked the circuit court to enjoin the city council from passing any zoning ordinances affecting the property and from issuing permits to construct the bank according to the plans submitted to the city. The circuit court disagreed with Heidrich's and Long's contentions and entered judgment for Lee's Summit and the bank. Heidrich and Long appeal.

We issued an opinion on March 21, 2000, affirming the circuit court's judgment. We granted Heidrich's and Long's motion for rehearing filed on April 5, 2000, to reconsider the issue of whether the city presented substantial evidence that the bank's site plans met the requirements of the city's comprehensive zoning ordinance, No. 715. After reconsideration, we again affirm the circuit court's judgment.

Heidrich and Long have been feuding with governing authorities in Lee's Summit for some time about the development of 138 acres of land which extends 1.25 miles north of U.S. 50 and is bounded on the west by Todd George Road. *See Heidrich v. City of Lee's Summit,* 916 S.W.2d 242 (Mo.App.1995). In 1978, Jackson County authorities zoned the land for "unplanned," commercial use. Lee's Summit annexed the land and, on April 7, 1992, rezoned it as a planned business district (C–P), and it became known as Charleston Park. Heidrich and Long sued Lee's Summit in 1992, challenging this rezoning. The circuit court upheld the rezoning. On appeal, this court upheld rezoning Phases II and III of Charleston Park but invali-

dated rezoning Phases IV and V.[1] *Id.*

On December 11, 1996, Community Bank obtained 1.74 acres of Charleston Park's Phase II. Preliminary development plans for Phase II indicated that it would be developed as a "strip shopping center" with seven pads comprising 293,000 square feet of structures and a parking lot for 1604 vehicles. The original plans did not provide for a building on the land purchased by Community Bank.

Across Todd George Road to the west of the tract is Silkwood Estates, a single-family residential subdivision. Long is Silkwood Estates' developer, and she owns a house in the subdivision which she uses as a model house and office. Heidrich owns a house and resides in the subdivision.

In September 1996, Community Bank applied for a special use permit to allow erection of a temporary structure on the property. City officials advised Charleston Park's owner, Tarquad, Inc., that Tarquad would have to file a revised preliminary site plan for Phase II. On October 10, 1996, Tarquad filed a revised preliminary site plan. The city's planning staff recommended that the city council deny a special use permit for the temporary building, and Community Bank and Tarquad withdrew their applications and the revised preliminary development plan for Phase II.

On March 10, 1997, Community Bank filed a final site plan for a building to house a full-service bank with four drive-up windows and an automated teller machine. The total site area was 1.742 acres. The site plan showed an 80-foot buffer between the proposed bank building and Todd George Road.

The city's planning commission scheduled a hearing on the plan for April 14, 1997. Before the hearing, however, city officials decided that the bank's final site plan changed Phase II's "ownership pat-

tern or stages of construction [and would] lead to a different development concept." City officials told Community Bank that it would have to file a revised preliminary development plan. On March 20, 1997, the bank filed its application for revised preliminary site plan approval. Section 170.B.5 of the city's comprehensive zoning ordinance provides that approval of a preliminary development plan, when granted separately from the rezoning of the subject property, must be done by amendment to the tract's original rezoning and only after a public hearing. The city, therefore, scheduled a public hearing for May 12, 1997.

On May 12, 1997, the city's planning commission held a public hearing. After the hearing, the commission unanimously recommended approval of the bank's preliminary site application. On June 3, 1997, the city council held a public hearing on the bank's application. After the hearing, the council passed a motion to approve the bank's preliminary site plan application. Thereafter, the council adopted an ordinance amending Charleston Park's original rezoning ordinance and approved the bank's final site plan application.

Heidrich and Long then filed their petition for declaratory judgment and injunction. The circuit court found that the bank's preliminary site plan application and the final site plan application reasonably conformed to the requirements of the city's comprehensive zoning ordinance and that the city council's decision to amend Charleston Park's rezoning ordinance to permit the bank building was not arbitrary and unreasonable. Heidrich and Long appeal.

■ In response to Heidrich's and Long's appeal, the bank asserts a cross-claim. It contends that the circuit court erred in not dismissing Heidrich's and Long's claim as moot. It argues:

---

**1.** Phase I was not rezoned because it was separately owned and had been developed for a church.

[T]he only relief prayed for by [Heidrich and Long] was injunctive relief prohibiting the issuance of building or occupancy permits ... which is now moot because all permits have been granted and the building has been built. Even if this Court determined that the [Lee's Summit] ordinance ... is unconstitutional or otherwise void, that relief would have no effect upon [the bank]. A ruling of this Court determining that the [Lee's Summit] ordinances ... are unconstitutional or void or that [Lee's Summit] approval of the [bank] was unauthorized, has no practical effect upon the real controversy which is [Heidrich's and Long's] objection to the construction and occupancy of the [bank].

Heidrich and Long, however, also sought the circuit court's declaration that the bank's preliminary and final site plans did not comply with the city's comprehensive rezoning ordinance. Even if construction is complete, we must determine whether zoning ordinances were violated and order the appropriate remedy. This court has the authority to order removal of the building if we determine that it was erected in violation of a zoning ordinance. *See* 4 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING § 29.03 (1986); DONALD G. HAGMAN AND JULIAN CONRAD JUERGENSMEYER, URBAN PLANNING AND LAND DEVELOPMENT CONTROL LAW § 23.6 (2ⁿᵈ ed.1986); 4 ARDEN H. RATHKOPF AND DAREN A. RATHKOPF, RATHKOPF'S THE LAW OF ZONING AND PLANNING § 45.04 (Edward H. Ziegler, Jr., reviser, 1999). This case is not moot.

■ In reviewing Heidrich's and Long's appeal, we are guided by the same standard of review as was announced in Heidrich's and Long's previous appeal:

[T]he exercise of zoning power is a legislative rather than a quasi-judicial function.... Upon review, this [c]ourt may reverse a legislative action "only if arbitrary and unreasonable, meaning that the decision is not 'fairly debatable.'" *Summit Ridge Dev. Co. v. Independence*, 821 S.W.2d 516, 519 (Mo.App.

1991) (citations omitted). A decision is considered arbitrary and unreasonable if it bears no substantial relationship to the public health, safety, morals, or general welfare. *State ex rel. Barber & Sons Tobacco Co. v. Jackson County*, 869 S.W.2d 113, 117 (Mo.App.1993).... Zoning ordinances are presumed valid and "any uncertainty about the reasonableness of a zoning regulation must be resolved in the government's favor." *Id.*

*Heidrich*, 916 S.W.2d at 248–49. "The reservation of authority in the city council to approve an amendment to the original development plan by ordinance is indicative of a legislative function[.]" *McCarty v. City of Kansas City*, 671 S.W.2d 790, 795 (Mo.App.1984). When reviewing legislative actions, our scope of review is not limited to the record presented to the legislative body. *State ex rel. Helujon, Ltd. v. Jefferson County*, 964 S.W.2d 531, 536 (Mo.App.1998).

In their first point, Heidrich and Long assert that the circuit court erred in upholding the ordinance, No. 4453, amending Charleston Park's Phase II to permit the bank building. They argue that the city did not present substantial evidence establishing that the bank's preliminary and final site plans met the requirements of the city's comprehensive zoning ordinance, No. 715. Heidrich and Long allege numerous deficiencies of the bank's preliminary and final site plans.

■ First, they note that § 170.B.2 of Ordinance No. 715 requires that any tract being zoned C–P must contain at least 2.5 acres and that the net land area for the bank is far less. Section 170.B.2 says, "The net area of land to be included in a District C–P and so designated shall be at least two and one-half acres unless a smaller area is specifically approved by the Planning Commission due to special and unusual circumstances."

Heidrich's and Long's contention is wrong. The bank's tract is not a separate district. The ordinance approving the

bank building, No. 4453, clearly said, "This ordinance shall be considered an amendment to Ordinance 3645, [Charleston Park's original rezoning ordinance,] and the preliminary site plan attached thereto, by which the subject property was rezoned. Development of the . . . property shall be in accordance with the original preliminary site plan and this amendment." The city council's approval of the bank's preliminary and final site plans did not create a new district; rather, the city council amended the site plan for the area to allow for development of the bank within the existing district, Charleston Park. The area included in the original preliminary site plan for Charleston Park is greater than 2.5 acres. The city's actions, therefore, complied with the net land area requirement of § 170.B.2.

Next, Heidrich and Long assert that the planning commission and the city council failed to determine the adequacy of thoroughfares to carry any additional traffic that the bank would generate, as required by the comprehensive zoning ordinance. Section 170.B.3 of the ordinance says, "The location of any C–P shall be on property which has or will have direct access to major thoroughfares, and the Planning Commission and City Council shall satisfy itself as to the adequacy of the thoroughfares to carry the additional traffic projected to be generated by the development." Contrary to Heidrich's and Long's contention, this section did not require the planning commission or the city council to make a separate traffic study for the bank. It merely required the commission and the council to satisfy themselves that thoroughfares around the tract were adequate.

The record establishes that traffic was discussed at the public hearings. The planning commission specifically asked David Robinson, the city's director of community development, whether a traffic study needed to be done. Hearing minutes indicate that he responded that the "staff did not feel [that a traffic study] was

[necessary] because of the scale of the original approval, and this is relatively minor" and because "it did not appear to staff to have any significant effect on traffic considering the whole site plan." Robinson also told the city council at the public hearing that the traffic capacity was adequate for the area. He also submitted to the city council the traffic study for the entire Charleston Park project and a letter from TransSystems confirming the traffic study and stating that the bank would not change the traffic study's conclusions. Christine Bushyhead, city attorney, told the city council that the city's traffic engineer who performed the original traffic study, Tom Swenson, had concluded that the bank did not cause a need for any additional traffic impact changes to the original traffic study completed in 1991. Swenson opined to the circuit court that a new traffic study did not need to be prepared. Although Heidrich's and Long's witness, Land Planner Eric Strauss, testified that he believed that the original traffic study was out of date, we defer to the council's determination that it was satisfied that the evidence before it established that the thoroughfares around the bank were adequate.

Heidrich and Long also contend that the bank site plan violated the requirement of § 170.B.4.a that "[a] preliminary development plan . . . include more than one use." The bank's preliminary site plan was an amendment to the original preliminary site plan that rezoned the Charleston Park commercial development to C–P. The original preliminary site plan provided for a variety of uses. Adding the bank building merely amended the original plan and represented a specific use within the district. Contrary to Heidrich's and Long's assertion, Lee's Summit did not create a new district.

Next, Heidrich and Long assert that the bank was not architecturally and functionally unified with Phases II and III of Charleston Park and that it affected the

uses of their property. Section 170.B.5 of the city's comprehensive zoning ordinance says:

> Approval of a preliminary development plan, when granted separately from the rezoning of the subject property, shall be in the form of an amendment to the ordinance by which the subject property was rezoned.

> In addition to being in compliance with all other provisions of this section, the preliminary development plan

> a. shall be [sic] present an architecturally and functionally unified design for the proposed buildings and service facilities and

> b. shall not adversely affect the uses of properties immediately adjacent to the proposed development.

The architectectural theme for Charleston Park was southern colonial. As stated by architect James Marshall, one of Heidrich's and Long's witnesses, the bank's architectural style was colonial, and it incorporated southern colonial features. Moreover, Robinson testified that the bank proposed "an architecture that we felt was consistent with what had been proposed for the Charleston Park development."

Larry Witt, the city's expert appraisal witness, told the circuit court that the bank would not have "a detrimental impact on the continued use and enjoyment of [nearby residential] property."[2] He explained that, because commercial development was already in existence in the area, "the additional impact of the bank would be negligible[.]" Although Heidrich and Long presented contrary evidence, we defer to the circuit court's ability to assess credibility. *Helujon*, 964 S.W.2d at 537. Moreover, to the extent that Heidrich's and Long's complaint concerns the lack of credibility of Witt's opinion, that was a matter for the circuit court to decide.

Robinson also testified that the bank would not affect use of the property immediately adjacent to the bank. He noted that the subdivision was a considerable distance from the bank and across Todd George Road and buffered from the bank.

■ Next, Heidrich and Long assert that the bank site plan did not demonstrate, as required by the city's comprehensive zoning ordinance, that its proposed use was mutually compatible or mutually supporting of any other use or that it enhanced the economic viability of any other use. Section 170.B.4.c says, "Uses shall be mutually compatible; that is, within the Planned Business District, they shall be mutually supporting so that each use enhances the economic viability of other uses and facilitates full development of the Planned Business District in accordance with the approved plan."

Heidrich and Long contend that the bank constituted a deviation from the approved plan for Charleston Park and did not facilitate full development of Charleston Park. They rely primarily on a letter by Bushyhead and Robinson to the planning commission that said:

> [T]he changes in ownership patterns or stages of construction in Charleston Park commercial development, including [the bank's application for a final site plan], appear to be leading to a different development concept then that originally approved by the City Council in 1992.... The current approved preliminary plan depicted a consistent architectural style and planned open space, traffic patterns, etc. which, through the development of McDonalds and now this application, now reflects a more individual lot type development pattern and not a full planned development concept as intended by the CP zoning classification. The current application places a single building site in an area currently shown on the approved plan as a parking lot for

---

2. Heidrich and Long pointed out that Witt testified that a change of the development concept in Charleston Park might cause him to a change his opinion. Witt, however, testified that the bank would not adversely affect the adjacent residential uses.

a larger multi-tenant commercial building. The CP zoning classification allows flexibility in development standards and site planning for large commercial developments, multiple tenants with unique site plan needs, yet the development must be constructed consistent with the approved concept.

As a result, the Planning Officer has determined that the Community Bank of Lee's Summit application constitutes a substantial change that leads to a different development concept and a deviation from the approved plan. This requires the applicant to apply for a preliminary rather than final development plan approval. Preliminary development plan approval requires the same public hearing process as a rezoning under the CP zoning ordinance. This public hearing process is required because a CP zone approval of a preliminary development plan, when granted separately from the rezoning of the subject property, shall be in the form of an amendment to the ordinance by which the subject property was rezoned.

Although Bushyhead and Robinson concluded that the bank's application led to a "different development concept and a deviation from the approved plan," their conclusion does not mean that the bank is not mutually compatible or mutually supporting of Charleston Park or that it would not facilitate the district's full development in accord with the approved plan. Robinson testified at the public hearings that the bank would provide a very commonly used service that would be supportive of the other uses in the area and be a positive contribution to the ultimate development of the area.

Moreover, the zoning ordinances contemplated that substantial changes would occur in approved preliminary development plans, and they made provision for approval of those changes by the planning commission and city council. *See* §§ 170.G and 400. That process was followed in this case. Heidrich's and Long's contention is without merit.

Heidrich and Long also assert that the bank site plan did not contain necessary site information as required by § 170.E.1.b.[3] In particular, they allege that the plan did not include "[e]xisting topography with contours at an interval to be determined by the Planning Officer," "[s]ufficient dimensions to indicate relationships between buildings, property lines, parking areas and other elements of the plan," and "[t]he proposed methods and locations of all buffers." Section 170.-E.1.b(1), (3) and (7).

The site plan for the bank did show topography. Although Heidrich and Long assert that the site plan did not use the same "datum" standard as used in the original preliminary site plan for Charleston Park, we find nothing in the ordinance requiring use of the same standard. Robinson told the circuit court that the site plan showed topography and that it used an arbitrary datum point. He said that, by using an arbitrary datum point, "surveyors would have picked a point on the property as the base from which to measure [and] then all elevations would have been measured from that point." He said that the purpose for showing topography is to show drainage and that an arbitrary datum point is acceptable for this purpose.

The bank site plan's not showing dimensions between buildings and property lines and parking areas was not a violation because the comprehensive zoning ordinance states that the information is limited to the "subject property only."

---

3. Section 170.E requires that certain information be included in a preliminary development plan if the property "already is zoned C-P" and is "in conjunction with an application for a grading or building permit for development of the property." The city does not contest that § 170.E applies to the bank's application, and the record establishes that the bank did file an application for a building permit prior to the city council's approval of the amendment ordinance.

The subject property at issue is the bank site plan, not the entire development in Charleston Park. The bank site plan contains only one building. It, therefore, satisfied this requirement.[4]

■ The bank plan also shows an 80–foot landscape buffer. Although the bank does not own the buffer,[5] it was still shown on the bank's site plan when the planning commission and city council acted on the bank's application.[6] Moreover, Robinson noted the location of the 80–foot buffer in his testimony before the circuit court. Heidrich's and Long's contention is without merit.

■ Heidrich and Long also contend that the bank's final site plans violated § 170.H.1.a(1) because the final site plan did not show finished grades or contours for the site. ·The landscape site plan that accompanied the final site plan displayed the contours for the site. Nothing in the ordinance required that all the information be provided in one document, as Heidrich and Long contend. The ordinance merely says that the "final development plan" shall contain the information.

■ Heidrich and Long also assert that the bank failed and refused to establish an agency for the ownership and maintenance of the 80–foot buffer strip as required by § 170.H.4.b. That section requires information to be submitted in support of the application for final development plan approval, including:

Evidence of the establishment of the agency for the ownership and maintenance of any common open space and all assurances of the financial and administrative ability of such agency required

pursuant to the approval of the preliminary development plan, if required by the terms of the approved preliminary development plan.

We find nothing in the record, and Heidrich and Long do not point us to anything, which establishes that the approved preliminary development plan required evidence of the establishment of the agency for the ownership and maintenance of the existing 80–foot buffer. A condition of approval for the Charleston Park development was the establishment of an 80–foot landscaped buffer along the east side of Todd George Road. The ordinance approving Charleston Park did not require the landscaped buffer to be dedicated to the public, and the bank site plan did not propose any changes to the 80–foot buffer. Moreover, although the ordinance approving the bank's site plan, No. 4453, contained a legal description which indicated that the 80–foot buffer was to be "dedicated as Todd George Road Right–Of–Way Green Area," this phrase was not a condition of approval for passage of the site plan.

Next, Heidrich and Long assert that the bank's site plan fails to show property within 300 feet of the bank's property and, therefore, did not comply with § 400 which says:

The regulations, restrictions and boundaries contained in this ordinance may from time to time be amended, supplemented, changed, modified or repealed by the Board of Aldermen, either on its own motion, or on application or petition therefore by the owner, in writing filed with said Board of Aldermen of the City of Lee's Summit.

4. The bank's final site plan also did not violate the comprehensive zoning ordinance because it showed the property lines and parking areas.

5. Originally, when the bank purchased the land from Tarquad, Tarquad erroneously included the 80–foot buffer strip in the conveyance to the bank. The bank, therefore, deeded this land back to Tarquad.

6. Heidrich and Long acknowledge this by complaining that no topography or contours were shown on the 80–foot buffer strip indicated on the site plan. The city council obviously found that the topography and contours provided on the rest of the site plan were sufficient.

... Said application or petition shall be accompanied by a plat or map drawn to a scale of not less than two hundred (200) feet to the inch showing the land in question, its location, the length and location of each boundary thereof, the location of property within three hundred (300) feet of such land and a filing fee payable to the City of Lee's Summit.

We are uncertain what this section pertains to, and the parties offer no illumination. Heidrich and Long merely assert that the bank did not comply with the section, and the bank says that it did. Section 400 says, "The regulations, restrictions and boundaries contained in *this* ordinance may from time to time be amended, supplemented, changed, modified or repealed by the Board of Aldermen[.]" From the face of it, "this ordinance" seems to refer to the comprehensive zoning ordinance and has no application to the bank's rezoning ordinance. Nothing in the record suggests that this is incorrect or causes us to believe that "this ordinance" refers to the bank's application; hence, we decline to review the matter. Section 170.G.1.b of the comprehensive rezoning ordinance says, "Substantial or significant changes in the preliminary development plan may be approved after rehearing by the Planning Commission and the City Council in accordance with Section 400, Amendments and the provisions of this Section 170." Given the confusing language of § 400, we are unsure how § 400 applies to § 170. Heidrich and Long failed to meet their burden of proof on this issue. *Helujon*, 964 S.W.2d at 540.

■ Heidrich and Long also assert violations of §§ 260.D.1.b, c and g. Although their point relied on asserted that the circuit court erred in concluding that the bank's site plan met the requirements of § 260, none of Heidrich's and Long's subpoints to the point relied on concerned the specific requirements of § 260. Hence, these alleged violations were not preserved for our review. *Lush v. Woods*, 978 S.W.2d 521, 525 (Mo.App.1998). Moreover, § 260.C.1 says that the intent and purpose of site plan review is "intended to ensure the adequate review and consideration of potential impacts of proposed development upon surrounding uses and activities, and to encourage a high standard of site and building design." The record establishes that the planning commission and city council adequately reviewed and considered the potential impacts of proposed development upon surrounding uses and activities.

■ Substantial evidence existed in the record establishing that the bank's site plan met the necessary requirements that Heidrich and Long alleged have been violated. To the extent that Heidrich's and Long's complaint is that the circuit court relied on the wrong standard in determining compliance with the requirements, we need not resolve the issue. Although the circuit court held that the bank's site plans "reasonably conformed" to the requirements of the zoning ordinance, we find substantial evidence of compliance. .

■ In their second point, Heidrich and Long allege that, before the city council could approve the bank's site plan and pass Ordinance No. 4453, the Charleston Park preliminary site development plan had to be revised and approved by the city council at the same time that the city council approved the bank's site plan. Heidrich and Long assert:

It is our opinion that the entire original preliminary site plan must be revised to show the change in the use of the land sought, the change in the required square footage, the change in the number and location of parking spaces provided and percentage of landscaping and the location and configuration of all improvements on the site, as a result of the changes. Then the City Council will have the opportunity to review the "before" plan and the "after" plan and make its decision accordingly.

We disagree.

Again, we are free to reverse the city council's decision only if it is arbitrary and

unreasonable. *Heidrich*, 916 S.W.2d at 248. If the decision is "fairly debatable," we cannot reverse. *Id.* Moreover, we resolve any uncertainty about the reasonableness of a zoning regulation in the city council's favor. *Id.* at 249.

Because the bank's site plan was a substantial change in the preliminary development plan for Charleston Park, § 170.G required that the change be approved by an amendment to the original preliminary plan. The ordinance did not require that the planning commission and the city council approve the entire Charleston Park project again, but only "substantial or significant changes" in the preliminary development plan. They did that. Although Heidrich's and Long's assertion is logical, it is also fairly debatable. Hence, we deny their point.

Heidrich and Long also contend that the city council's decision to adopt Ordinance No. 4453 and to approve the bank's site plan was arbitrary and unreasonable and not fairly debatable. They point to numerous deficiencies, some of which we have dealt with in previous points.

First, Heidrich and Long complain that the city council's decision was arbitrary and unreasonable because the city council approved the ordinance without determining whether the bank's square footage was to be counted toward the allowable size of Phase II in Charleston Park or whether it was in addition to that shown on Phase II. They assert that (1) if the square feet of the bank were to be counted toward the amount previously approved for Phase II, then a revised site plan for Phase II should have been submitted, or (2) if the bank's space is in addition to the number of square feet previously approved for Phase II, the city council should have required a new traffic study. These are essentially the same arguments that Heidrich and Long made earlier.

As we previously said, the ordinance did not require the bank to submit a revised site plan for all of Phase II of Charleston Park. To the extent that Heidrich and Long are arguing that the city council and the circuit court were misled as to whether the bank would increase the square footage or be counted toward the allowable square footage in Phase II, it is a fairly debatable issue. Although the city admitted in its answer to Heidrich's and Long's petition that approval of the bank site plan did increase the total square footage of Phase II, the record established that the city council was fully aware that by approving the bank's site plan it would result in a reconfiguration of the remaining parts of Phase II.

The city council's decision was not rendered arbitrary or unreasonable because the city did not require a new traffic study. As we said previously, neither the planning commission nor the city council was required to have a separate traffic study done. Section 170.E.4 says that a traffic impact analysis "may be required." The decision was within the discretion of the planning officer, the planning commission or the city council. Robinson, the planning officer, determined that a separate traffic study was not needed, and Swenson, the traffic engineer who did the initial traffic study, agreed. They agreed that the bank would not change the traffic study or impact the roads. Given this evidence and the discretion given to the city council in requiring a traffic study, the city council's decision was not arbitrary and unreasonable.

■ Finally, Heidrich and Long assert that the city council's decision was arbitrary and unreasonable because the bank's site plan did not meet all of the requirements of the zoning ordinance, and, as a result, neither the city council nor the trial court could determine whether the city council's decision bore a substantial relationship to the public health, safety, morals or general welfare. This is essentially the same argument that Heidrich and Long asserted in their first point. Having already found that substantial evidence existed in the record establishing that the

bank's site plan met the necessary requirements of the ordinance, we cannot say that the city council's decision was arbitrary and unreasonable. Heidrich's and Long's contention is without merit.[7]

Because the city council's decision to adopt Ordinance No. 4453 and to approve the bank's site plan was not arbitrary and unreasonable, but was fairly debatable, we affirm the circuit court's judgment.

HAROLD L. LOWENSTEIN, Judge, and ROBERT G. ULRICH, Judge, concur.

---

7. Heidrich and Long also asserted other factors which allegedly proved that the city council's decision was arbitrary and unreasonable. They failed, however, either to include these factors in their point relied on or to develop them in the argument portion of their brief. Hence, we deem them abandoned. *See Lush v. Woods*, 978 S.W.2d at 525; *Lusher v. Gerald Harris Const., Inc.*, 993 S.W.2d 537, 544 (Mo.App.1999).